1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11   KORY T. O'BRIEN,                        Case No.:  18-cv-00980-BAS-MDD

                                   Plaintiff,   **ORDER GRANTING DEFENDANTS'**
12                                              **MOTION FOR SUMMARY**
                                                **JUDGMENT**
13        v.
                                                **[ECF No. 66]**
14   LISA GULARTE, *et al.*,

                                 Defendants.
15

16        Plaintiff Kory T. O'Brien, a state prisoner housed at the R. J. Donovan Correctional

17   Facility ("RJD") in San Diego, California at the time of the relevant events, is proceeding

18   *pro se* and *in forma pauperis* with a Second Amended Complaint ("SAC") pursuant to 42

19   U.S.C. § 1983.  (ECF No. 40.)  He claims several RJD prison officials retaliated against

20   him for filing a complaint against one of them by failing to protect him from assault by

21   another inmate, in violation of his rights under the First, Eighth and Fourteenth

22   Amendments to the United States Constitution and various state laws.  (*Id*. at 1–18.)

23        Currently before the Court is a Motion for Summary Judgment by Defendants

24   Bierbaum, Ekwosi and Flores, the only remaining Defendants in this action.  (ECF No. 66.)

25   They contend: (1) the undisputed evidence shows they did not know of or disregard a threat

26   to Plaintiff's safety and did not act with a retaliatory motive; (2) they are entitled to

27   qualified immunity because they responded reasonably to Plaintiff's concerns about the

28   inmate who allegedly assaulted him; and (3) the Court should decline to exercise

supplemental jurisdiction over the state law claims which do not provide for private causes of action and lack merit. (*Id*. at 16–27.)

Plaintiff has filed an Opposition. (ECF No. 79.) He argues: (1) the undisputed evidence shows Defendants knew or should have known of a risk of assault and failed to prevent it under circumstances implying retaliation for his complaint; (2) they are not entitled to qualified immunity because his rights to be free from retaliation and deliberate indifference to his safety were clearly established at the time of the incident; and (3) the Court should exercise its discretion to address his meritorious state law claims. (*Id*. at 189–204.)

Defendants have filed a Reply. (ECF No. 80.) They dispute Plaintiff's contention they were or should have been aware of a risk to his safety and argue his reliance on the timing of events alone does not support a retaliation claim. (*Id*. at 2-3.)

For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.[1]

# I.   BACKGROUND

## A.   Procedural History

Plaintiff initiated this action by filing a Complaint on May 16, 2018, naming four RJD employees as Defendants: Lisa Gularte, Mike Bierbaum, Ed Flores and Anthony Ekwosi. (ECF No. 1.) Prior to the appearance of any Defendant, Plaintiff filed a First Amended Complaint adding Defendant R. Garcia. (ECF No. 13.) On January 2, 2019, the Court *sua sponte* dismissed all claims against Defendant Garcia and granted the remaining Defendants' motion to dismiss with leave to amend only as to Defendants Bierbaum, Ekwosi and Flores. (ECF No. 36.)

On February 14, 2019, Plaintiff filed the SAC, the operative pleading in this action, renaming all five Defendants. (ECF No. 40.) On June 20, 2019, on Defendants' motion, the Court dismissed Defendants Gularte and Garcia and Plaintiff's equal protection claim

---

[1] Although this matter was randomly referred to United States Magistrate Judge Mitchell D. Dembin pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter. *See* S.D. Cal. CivLR 72.1(d).

from the SAC.  (ECF No. 51.)  The Court noted that the only remaining Defendants in this action are Bierbaum, Ekwosi and Flores, and the only remaining claims are for failure to protect under the Eighth Amendment, retaliation under the First Amendment, a substantive due process claim for state-created danger under the Fourteenth Amendment, and state law claims.  (*Id*. at 5.)  Defendants Bierbaum, Ekwosi and Flores filed an Answer to the SAC on July 2, 2019.  (ECF No. 53.)

On February 13, 2020, Defendants Bierbaum, Ekwosi and Flores filed the instant Motion for Summary Judgment.  (ECF No. 66.)  Plaintiff filed an Opposition on March 13, 2020.  (ECF No. 79.)  Defendants filed a Reply on March 23, 2020.  (ECF No. 80.)

## B.   Factual Allegations

Plaintiff alleges in the SAC that on April 11, 2017, he was working at the shoe factory at RJD, operated by the California Prison Industry Authority ("CALPIA"), when Defendant Ekwosi, the Trimming and Shipping Supervisor, "used profanity at Plaintiff." (SAC at 3.)  Plaintiff lodged a complaint about Defendant Ekwosi's language with Defendant Flores, the Plant Supervisor.  (*Id*.)  After three weeks of asking Defendant Flores about the status of the investigation into his complaint, Defendant Flores told Plaintiff that Defendant Ekwosi denied any inappropriate behavior.  (*Id*.)  On May 4, 2017, Plaintiff sent a letter to the CALPIA main office and to Lisa Gularte, a CALPIA Supervisor, asking for Defendant Ekwosi to apologize and receive training.  (*Id*.)  CALPIA Supervisor R. Garcia replied to the letter and stated that Defendant Ekwosi denied using profanity.  (*Id*.)

Plaintiff alleges Inmate Thompson was hired to work at the shoe factory shortly after he filed his complaint about Defendant Ekwosi's use of profanity.  (SAC at 3.)  Plaintiff states that he notified Defendants Flores and Bierbaum that he and Inmate Thompson had a prior altercation and that Defendant Bierbaum was also notified of the prior altercation by Inmate Supervisor Abundiz.  (*Id*.)  Plaintiff alleges that instead of preventing another altercation with Inmate Thompson, "the management found that they could administer a form of retaliation as a form of punishment for" filing his complaint.  (*Id*.)  He alleges Defendant Ekwosi, Inmate Thompson's supervisor, along with the shoe factory

"management," allowed Inmate Thompson to repeatedly enter the area of the shoe factory where Plaintiff worked and eventually assigned him to Plaintiff's department.  (*Id.* at 3–4.) Plaintiff alleges he informed Defendants numerous times of his fear of Inmate Thompson and was told by Defendant Bierbaum to quit or change departments.  (*Id.* at 7–8.)

Plaintiff alleges that on July 17, 2017, Inmate Thompson verbally and physically assaulted him, resulting in Plaintiff receiving a black eye with partial loss of vision and sporadic eye pain.  (SAC at 8.)  He claims Defendants Bierbaum, Flores and Ekwosi, in retaliation for his filing his complaint against Defendant Ekwosi, breached their duty to protect him from assault by failing to supervise their workplace and allowing Inmate Thompson to be assigned to and freely enter Plaintiff's work area.  (*Id.* at 3, 9.)

**C.     Arguments on Summary Judgment**

Defendants seek summary judgment on Plaintiff's deliberate indifference claim on the basis that the undisputed evidence shows: (1) Plaintiff voluntarily chose to work with Inmate Thompson; (2) Plaintiff and Inmate Thompson were on the same yard and frequently came into contact with each other away from the shoe factory but had not had an altercation since their original February 8, 2017 altercation, after which they agreed they could safely program together; (3) the shoe factory has an open floor plan and their assignments to the various departments created no danger which did not exist on the yard; (4) Defendants accommodated Plaintiff's concern each of the three times he complained that Inmate Thompson was assigned to work in the same area by granting Plaintiff's request to leave work early once and reassigning Inmate Thompson twice; (5) Plaintiff's "assault" by Inmate Thompson occurred after Inmate Thompson pointed his finger at Plaintiff and allegedly said "fuck you" and walked away, after which Plaintiff went after him, said "fuck you" back, and they began to fight; (6) no intervention by staff or inmates was necessary to break up that brief altercation and they both finished their shifts without further incident; (7) Plaintiff attempted to fight Inmate Thompson later that evening but Inmate Thompson ran away; and (8) they both signed a new compatibility chrono the next day and continued to safely program together.  (ECF No. 66   at 17–21.)  As to Plaintiff's retaliation claim,

Defendants contend the undisputed evidence shows: (1) the decision as to which inmates to hire is not theirs and they merely choose names off a candidate list as jobs become available; (2) Inmate Thompson was placed on a wait list for employment over a month before Plaintiff filed his complaint against Defendant Ekwosi; (3) there was no indication Plaintiff and Inmate Thompson could not safely work together given their compatibility chronos and ability to successfully program together on the yard; (4) Defendants accommodated Plaintiff by granting his request to assign Inmate Thompson to another section of the shoe factory two of the three times he complained and granting Plaintiff's request to leave work early once; (5) Plaintiff never informed Defendants of the nature of any issue he had with Inmate Thompson, and (6) Plaintiff acknowledges he did not know Inmate Thompson would assault him.  (*Id*. at 21–22.)

Defendants further contend Plaintiff cannot bring a substantive due process claim where, as here, the Eighth Amendment provides explicit constitutional protection, and in any case such a claim fails for the same reasons his First and Eighth Amendment claims fail.  (*Id*. at 23.)  They claim they are entitled to qualified immunity because even if a constitutional violation occurred, the undisputed facts show they acted reasonably in allowing Inmate Thompson to work in the shoe factory because Plaintiff voluntarily programmed with Inmate Thompson and twice declined opportunities to be isolated from him.  (*Id*. at 23–24.)  Finally, Defendants contend the Court should decline to exercise its discretion to address the state law claims because they do not provide for private causes of action and are without merit, and that his request for injunctive relief is moot because he no longer works at the shoe factory and is no longer housed at RJD.  (*Id*. at 24–26.)

Plaintiff opposes summary judgment, contending that: (1) although he and Inmate Thompson safely programmed together on the yard, the shoe factory is different, as there are tools available to be used as weapons and no correctional staff on the factory floor; (2) Defendants were aware there was a risk of assault by his conversations with them on the day Inmate Thompson started work and the day they allowed him to leave early, and their "accommodations" showed an awareness of a risk but they were deliberately

indifferent to that risk and in fact increased it by allowing Inmate Thompson unrestricted access to the factory floor; and (3) the timing of events implies a retaliatory motive.  (ECF No. 79 at 189-204.)  He argues Defendants are not entitled to qualified immunity because his rights to be free from retaliation and deliberate indifference to his safety were clearly established at the time of the events, and that his state law claims are meritorious.  (*Id.*)

Defendants reply that Plaintiff has failed to substantiate his contention that the shoe factory is more dangerous than the yard because his two altercations with Inmate Thompson, one on the yard and one in the factory, were similar and no tools were used in either instance.  (ECF No. 80 at 2.)  They contend Plaintiff's theory they were aware of a risk of assault by their two conversations ignores the undisputed facts that: (1) Plaintiff told Defendants he was satisfied with Inmate Thompson working in a different section after their conversation on the day Inmate Thompson was hired, (2) Defendants were aware the two inmates had signed a compatibility chrono, (3) Plaintiff never requested Inmate Thompson be placed on his enemies list and voluntarily continued to program with him including standing together in the pill line where their first altercation occurred, (4) his only report of a problem with Inmate Thompson to the Defendants was accommodated when Plaintiff's request to leave work early on July 10, 2017 was granted, and (5) Plaintiff never informed the Defendants he felt uncomfortable with Inmate Thompson on the day of the incident.  (*Id.* at 2-3.)  Defendants contend Plaintiff's reliance on the timing of the hiring of Inmate Thompson to show retaliation fails because it is undisputed he was added to the wait list a month before Plaintiff filed his unfounded complaint against Defendant Ekwosi, and because Plaintiff never spoke to Ekwosi about that complaint.  (*Id.* at 3.)

## II.   LEGAL STANDARD

Defendants are entitled to summary judgment if they demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party must show "the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In order to avoid summary judgment, the nonmovant must present "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Id*. at 255.  The nonmovant's evidence need only be such that a "jury might return a verdict in his favor."  *Id*. at 257.  The Court "should construe liberally motion papers filed by *pro se* inmates and should avoid applying summary judgment rules strictly."  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

## III.   DISCUSSION

### A.   Evidence in Support of and Opposition to Summary Judgment

#### 1.   Evidence in Support

Defendants submit as evidence portions of Plaintiff's deposition, portions of the California Department of Corrections and Rehabilitation ("CDCR") Operations Manual, the February 8, 2017 and July 18, 2017 CDCR 128b compatibility chronos signed by Plaintiff and Inmate Thompson, a portion of Inmate Thompson's employment file, videotape footage of the snipping section of the RJD shoe factory and of the July 17, 2017 incident in the sewing section, as well as declarations from Defendants Ekwosi, Flores and Bierbaum, RJD Litigation Coordinator Joseph Giurbino, and Deputy California Attorney General Lyndsay Crenshaw, who represents the Defendants in this action.

Defendant Ekwosi states in his declaration that he is the supervisor responsible for the snipping and shipping section of the RJD shoe factory.  (ECF No. 66-4 at 1.)  The shoe factory is located in a large warehouse adjacent to Facility D; it has an elevated office with glass windows providing unobstructed views of the factory floor, which is C-shaped with

- 7 -

the sewing section to the left, the snipping and shipping section in the center, and the molding section to the right. (*Id*. at 1–2.) The three sections are not divided by barriers and employees are permitted to pass through all sections as necessary. (*Id*. at 2.) Defendant Ekwosi states that his primary duties include supervision of work performed in the finishing section, which requires him to spend time in all areas of the factory, including the office. (*Id*.) There are no custody staff in the factory and he does not carry pepper spray or a baton, but has a personal alarm he can activate to summon correctional staff as necessary. (*Id*.) He states that the factory can employ a maximum of 56 inmates, that the inmates apply for factory jobs pursuant to the process outlined in CDCR Department of Operations Manual section 51121.4.3. Although Ekwosi says he does not participate in the hiring process, once an inmate is hired "there is some discretion regarding work assignments based on a particular inmate's skills and needs." (*Id*.) He was not working on July 17, 2017. (*Id*.) As a supervisor he has limited-level access to the inmates' Central Files, known as SOMS, which contain CDCR 128b compatibility chronos. (*Id*.)

Defendants Flores and Bierbaum provide declarations nearly identical to that of Defendant Ekwosi, with the exception that Defendants Flores and Bierbaum were working on July 17, 2017, and Defendant Bierbaum does "participate in the hiring process." (ECF No. 66-5 at 1–2; ECF No. 66-8 at 1–2.) They state they did not witness the altercation between Plaintiff and Inmate Thompson that day and only learned about it the next day by viewing a videotape of the incident, and both inmates were immediately fired per CALPIA policy. (ECF No. 66–5 at 2; ECF No. 66–8 at 2.)

RJD Litigation Coordinator Giurbino states in his declaration that the attachments to the summary judgment motion are accurate copies of the February 8, 2017 and July 18, 2017, CDCR 128b compatibility chronos signed by Plaintiff and Inmate Thompson, the video footage from the shoe factory from July 17, 2017, and a portion of Inmate Thompson's work history. (ECF No. 66-6 at 2.) Inmate Thompson's work history shows he was placed on the wait list to work at the shoe factory on March 9, 2017. (ECF No. 66-2 at 67.) The July 18, 2017, CDCR 128b compatibility chrono is signed by Plaintiff and

Inmate Thompson and indicates they both independently stated that their July 17, 2017 incident in the shoe factory was a misunderstanding, they do not consider each other enemies, and they can remain housed on Facility D without further incident.  (*Id*. at 66.) Similarly, the February 8, 2017, CDCR 128b compatibility chrono is signed by Plaintiff and Inmate Thompson and indicates they both independently stated the physical altercation/fight they engaged in that day was a misunderstanding, they do not consider each other enemies, and they can remain housed together on Facility D without further incident.  (*Id*. at 65.)

Lyndsay Crenshaw, a Deputy California Attorney General representing the Defendants in this action, states in her declaration that she has attached true and correct copies of portions of Plaintiff's December 4, 2019 deposition in this case, and a true and correct copy of CDCR Operations Manual section 51121.4.3, titled "Recruitment and Hiring Process."  (ECF No. 66-7 at 1–3.)

Plaintiff stated in his deposition that his February 8, 2017 altercation with Inmate Thompson began when he cut in front of Plaintiff in the noon pill line as inmates often do. (ECF No. 66-2 at 17.)  Plaintiff told him to wait and they exchanged profanity.  (*Id*. at 17–19.)  Inmate Thompson then "rushed" at Plaintiff in a confrontational manner and Plaintiff pushed him, the alarm sounded, everyone got on the floor, and the confrontation ended; they both signed a compatibility chrono indicating they could safely remain on the same yard.  (*Id*.)  They both lived in building 18 on D-yard at that time.  (*Id*. at 45.)  Plaintiff immediately requested to be moved to another housing unit on the same yard but said he did not inform the inmate clerk who approved his transfer he wanted to move due to a concern about Inmate Thompson.  (*Id*. at 23.)  He was moved about two weeks later to housing unit 16 on D-yard while Inmate Thompson stayed in D-yard housing unit 18.  (*Id*. at 23, 45.)

Plaintiff said his first interaction with Defendant Ekwosi was on April 11, 2017, when Plaintiff asked him to unlock a door so he could go back to work and Defendant Ekwosi replied: "Fuck you, you can wait," which was overheard by other inmates.  (*Id*. at

46, 49–50.)  When Plaintiff informed Defendant Flores that same day about Defendant Ekwosi's use of language, Defendant Flores said to "give them a couple of days, he would figure it out."  (*Id*. at 48.)  Plaintiff sent a letter to a CALPIA employee named Garcia on May 4, 2017, with a copy to CALPIA, complaining about that incident and requesting an apology from Defendant Ekwosi.  (*Id*. at 46-48.)  Garcia responded within a week stating that he spoke with Defendant Ekwosi who said he did not use profanity and there was no need for an apology.  (*Id*. at 48.)  Plaintiff said he believed Inmate Thompson was hired to assault him in retaliation for that complaint because: (1) his complaint letter was dated May 4 and Inmate Thompson was "immediately" hired on May 25; (2) he was told by other inmates who he could not name and were no longer in custody that Inmate Thompson had been wanting to work in the shoe factory "for a while"; (3) the Defendants had access to Plaintiff's SOMS file which showed from their prior altercation that Inmate Thompson had "a propensity of violence toward" Plaintiff; and (4) Defendants allowed Inmate Thompson to work in Plaintiff's area, and in fact sent Plaintiff away from work rather than Inmate Thompson when Plaintiff told Defendants he had concerns with Inmate Thompson.  (*Id*. at 50–52.)

Plaintiff stated that when he arrived at work on May 25, 2017, Inmate Thompson's first day of work, and saw Inmate Thompson had been assigned to the sewing department where Plaintiff worked, he told Defendants Flores and Bierbaum he did not feel "comfortable" with Inmate Thompson working in the same department because Inmate Thompson was "unpredictable."  (*Id*. at 25–26.)  Before Inmate Thompson began to work, Defendants changed Inmate Thompson's work assignment to the snipping department, about 20 to 25 feet away from the sewing department.  (*Id*.)  Plaintiff said he was satisfied with that result until July 10, 2017, and that he and Inmate Thompson ignored each other during the interim.  (*Id*. at 27–28.)  He said he knew Inmate Thompson was hired for the express purpose of performing mechanical repair work.  (*Id*. at 30.)

Plaintiff said that on July 10, 2017, Defendants Flores and Bierbaum temporarily allowed Inmate Thompson to repair a canvas cutting press in the sewing department about

- 10 -

18cv980

10-20 feet inside the boundaries of the sewing department and about 25 to 30 feet from Plaintiff's workstation. (*Id*. at 29–30, 51, 61.) When Plaintiff asked Defendant Flores why Inmate Thompson was in the sewing section, Defendant Flores spoke with Defendant Ekwosi, Inmate Thompson's immediate supervisor, and the two Defendants told Plaintiff they were going to have Inmate Thompson work on that machine. (*Id*. at 30–31.) Plaintiff told them it made him feel "uncomfortable." (*Id*. at 31.) Plaintiff said Defendants Ekwosi and Flores started to answer him but before they could he interrupted them and asked to leave work and they said yes. (*Id*.) Plaintiff said he did not discuss the matter with the Defendants again until after the July 17, 2017 incident. (*Id*. at 32.)

Plaintiff said that on July 17, 2017, he was working at his usual station in the sewing section, had no indication Inmate Thompson was angry or upset with him, and had not communicated anything about him to the Defendants other than their May 25th and July 10th discussions. (*Id*. at 33-34.) When Plaintiff saw Inmate Thompson repairing a machine in the sewing section, he told the "inmate lead for sewing," the first person in his chain of command under CDCR regulations, that if Inmate Thompson was going to work in the area Plaintiff needed to leave work. (*Id*. at 35–36.) The inmate lead for sewing then spoke to the "mechanic for sewing," and came back and told Plaintiff that the mechanic for sewing said Inmate Thompson was not needed in the sewing department and would be told to leave. (*Id*.) The inmate lead then spoke to Inmate Thompson. (*Id*. at 37.) Plaintiff did not hear that conversation but said it must have upset Inmate Thompson because he approached Plaintiff immediately after speaking with the inmate lead. (*Id*.) Inmate Thompson said something to Plaintiff which Plaintiff did not remember, other than it involved "a lot of F words." (*Id*. at 34.) Plaintiff stood up, "used a couple of F words at him," and told him to "get out of my face." (*Id*. at 35.) Plaintiff said he told Inmate Thompson something to the effect: "FU, if you got a problem, handle it in front of 18," which he explained is prison slang for if you are going to fight then fight in front of building 18, where Inmate Thompson was housed. (*Id*. at 38, 45.) Plaintiff then walked around to the front of his sewing station where Inmate Thompson hit him in the left eye with his right fist. (*Id*. at 38–39.) Plaintiff

then put Inmate Thompson in a "reverse chokehold" and told him: "I don't know what you were fucking thinking.  I should break your fucking neck.  And if you think you are going to go grab something, you're going to get hurt.  Leave me alone."  (*Id.* at 39–40.)  He then pushed Inmate Thompson away.  (*Id*. at 39–40.)  Inmate Thompson returned to his workstation and stayed away from Plaintiff for the rest of the day.  (*Id*. at 40.)  Plaintiff went back to his workstation and held ice on his swollen eye while working the rest of the day.[2]  (*Id*.)

Plaintiff said that in order to avoid being labeled a snitch he waited until the end of the day when he was alone with Defendant Flores to point out his swollen eye and tell him to check the videotape from his work area.  (*Id*. at 41–42.)  Later that night, Plaintiff confronted Inmate Thompson in front of housing unit 18 and told him, "we should finish this fight right now in front of 18."  (*Id*. at 54.)  Plaintiff wanted to fight but Inmate Thompson ran away, and other inmates then approached Plaintiff and asked him to leave Inmate Thompson alone.  (*Id*.)

Plaintiff stated that he and Inmate Thompson signed a compatibility chrono the next day because "neither one of us need to associate with each other," as they have minimum contacts because D-yard is so large with five separate buildings and they do not eat at the same time.  (*Id*. at 43–44.)  He said he is not afraid of Inmate Thompson punching him but is concerned with Inmate Thompson acquiring a weapon.  (*Id*. at 44.)  He said: "Inmate Thompson is a homosexual.  I do not deal with homosexuals.  That's another issue.  So I don't stay around Inmate Thompson."  (*Id*. at 56.)  After the July 17 incident, Plaintiff continued to live in housing unit 16 and Inmate Thompson continued to live in housing unit 18, and, although they saw each other on D-yard, they avoided one another.  (*Id*. at 45.)  Plaintiff said he attempted to interact with Inmate Thompson several times after the July 17 incident, once as they were leaving their disciplinary hearing when Inmate

---

[2] The Court has reviewed two properly authenticated five-minute video clips from the CALPIA shoe factory on the day in question.  (ECF No. 66-9.)  The footage does not include audio.  However, the Court finds that the visual footage appears consistent with the parties' description of events.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that where video footage is available, lower courts should "view [ ] the facts in the light depicted by the videotape" on summary judgment).

18cv980

Thompson told Plaintiff "he didn't want no problems and that it was over," to which Plaintiff replied: "Good.  I'm done with it too."  (*Id*. at 53.)  Another time, around July 2018, Plaintiff confronted Inmate Thompson on behalf of Plaintiff's cellmate regarding the length of time Inmate Thompson was taking to repair Plaintiff's cellmate's ear buds, which Plaintiff said was resolved amicably.  (*Id*. at 56–57.)  Plaintiff's cellmate arranged for Inmate Thompson to give his declaration in this case and wrote it for him to read and sign, and Plaintiff said he was surprised Inmate Thompson was cooperative.  (*Id*. at 57–58.)

## 2.  Evidence in Opposition

Plaintiff attaches to his Opposition portions of his own deposition (Exhibit A); sections 4 and 5 of the CDCR Operations Manual (Exhibits B and C); portions of the Defendants' declarations and interrogatory responses (Exhibits D through I); the February 8, 2017 Rules Violation Report ("RVR") regarding the incident that day between him and Inmate Thompson (Exhibit J); their February 8, 2017 CDCR 128b compatibility chrono (Exhibit K); the July 17, 2017 RVR regarding the incident that day at the shoe factory (Exhibit L); their July 18, 2017 CDCR 128b compatibility chrono (Exhibit M); a May 8, 2013 CALPIA memorandum regarding new employee orientation (Exhibit N); several CDCR form 22s regarding his complaint about Defendant Ekwosi and the follow-up investigation (Exhibit O); the May 4, 2017 letter Plaintiff wrote to CALPIA complaining about Defendant Ekwosi's use of profanity on April 11, 2017 (Exhibit P); Inmate Thompson's declaration dated September 2, 2017 (Exhibit Q); and an excerpt of Inmate Thompson's work assignment file (Exhibit R).[3]  (ECF No. 79 at 3-175.)

Inmate Thompson states in his declaration that he was involved in an altercation with Plaintiff at the shoe factory at approximate 9:00 a.m. on July 17, 2017.  Thompson says at

---

[3] Plaintiff's SAC and Opposition are signed under penalty of perjury.  (ECF No. 40 at 28; ECF No. 79 at 204.)  To the extent the allegations contained therein are within his personal knowledge they are treated as affidavits in opposition to the summary judgment motion.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995); *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct.").

no time before that altercation was he informed by CALPIA supervisors or management not to have contact with Plaintiff. (ECF No. 79 at 173.)  He was in the sewing department that morning "doing mechanical duties," and sewing department supervisor Defendant Bierbaum and trimming and shipping department supervisor Defendant Ekwosi were aware of his location. (*Id*.)  At approximately 8:45 a.m. an inmate supervisor asked him to vacate the sewing department because Plaintiff was uncomfortable with his presence there, and Inmate Thompson immediately confronted Plaintiff with profanity. (*Id*.)  He says Plaintiff "stood from his workstation and approached" Inmate Thompson, whereupon Inmate Thompson struck Plaintiff in the left eye with his right fist. (*Id*.)  He then turned to leave but Plaintiff grabbed him from behind for approximately ten seconds. (*Id*.)[4]  Inmate Thompson states he initiated all verbal and physical contact in that incident and was later found guilty of fighting. (*Id*.)

The RVR hearing regarding the July 17, 2017 incident includes Plaintiff's statement that he told the Defendants on July 10 he wanted to leave work because he was not feeling well and because he was uncomfortable working around Inmate Thompson. (*Id*. at 149.)  The interrogatory responses and declarations of the Defendants attached to Plaintiff's Opposition show Defendants admit that as supervisors they are responsible for workplace assignments and providing any accommodations needed by inmates, and they have access to inmates' SOMS files for those purposes. (*Id*. at 79, 88, 100, 108, 121.)  Defendant Bierbaum stated that, unlike the other two Defendants, he participates in the hiring process.  He says that the shoe factory was short-staffed on July 17, 2017 and he was the only supervisor on the floor, which required him to spend less time than usual in the sewing section. (*Id*. at 79, 90.)  Plaintiff argues the CDCR regulations provide that inmate safety must take precedence over all other considerations, that the supervisors are responsible for the safety of inmates in their assigned areas, for reporting incidents and for maintaining a safe work environment, and that an inmate's "behavior" must be considered in the hiring process. (*Id*. at 68–76, 194–95.)  He argues that a retaliatory motive can be inferred by the

---

[4] *See* footnote 2, *supra*.

timing of the events because Inmate Thompson was hired a little over a month after Plaintiff filed his complaint, Inmate Thompson had been on the wait list for over two-and-a-half months before that whereas Plaintiff had only been on the wait list for one month, and Defendants did not report the July 17th incident as required by regulations.  (*Id.* at 198-99.)  He contends that because CALPIA hiring procedures require consideration of an inmate's behavior, Defendants were or should have been aware of a threat to Plaintiff in hiring or supervising Inmate Thompson.  He argues this is because both his and Thompson's SOMS files contain information regarding their first altercation which shows Inmate Thompson's penchant for violence and Plaintiff's voluntary change of housing shortly thereafter.  (*Id.* at 200.)

### B.  Eighth Amendment Claim

Plaintiff seeks to hold Defendants liable under the Eighth Amendment for failure to protect him from assault by Inmate Thompson.  (ECF No. 40 at 7–9.)  He claims Defendants were deliberately indifferent to the risk he would be assaulted by Inmate Thompson by allowing him to work in the shoe factory despite Plaintiff warning them he was not comfortable around Inmate Thompson.  This warning, combined with Defendants' actual or constructive knowledge of the contents of their SOMS files, placed or should have placed them on notice Inmate Thompson posed a threat to Plaintiff's safety.  (*Id.*)

The Eighth Amendment's cruel and unusual punishments clause requires prison officials to protect inmates from violence at the hands of other inmates.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  It involves a subjective and an objective prong. *Wilson v. Seiter*, 501 U.S. 294, 296–302 (1991).  As to the objective prong, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  *Id.* at 298, quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The subjective prong requires a showing of "deliberate indifference," that is, that the defendants were acting "maliciously and sadistically for the very purpose of causing harm."  *Id.* at 302 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) and *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Accordingly, in order to establish an Eighth Amendment violation, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude he was placed at risk of "objectively, sufficiently serious" harm by the manner in which Inmate Thompson was hired or supervised by Defendants, that Defendants knew of that risk, and that they failed to take reasonable steps to prevent Inmate Thompson from assaulting Plaintiff. *See Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995); *Farmer*, 511 U.S. at 845–46 (holding that a prisoner must show a prison official is subjectively aware of a substantial risk of serious harm and disregards that risk by failing to respond reasonably). Although there must be actual knowledge of a threat, subjective awareness may be inferred from circumstantial evidence. *Farmer*, 511 U.S. at 842.

Defendants have the initial burden of showing summary judgment is proper "by showing the absence of a genuine issue as to any material fact." *Adickes*, 398 U.S. at 157. They contend there is no genuine issue of material fact in dispute with respect to an Eighth Amendment violation because the undisputed evidence shows there was no substantial risk of serious harm to Plaintiff by having Inmate Thompson work in the shoe factory. (ECF No. 66 at 16–21.) They contend Plaintiff's statements to them that he was "uncomfortable" around Inmate Thompson because he was "unpredictable" is not evidence of deliberate indifference. Plaintiff admitted he had no indication Inmate Thompson was angry with him or wanted to attack him on the day of the incident. Additionally, he and Inmate Thompson had been successfully programming together since their previous altercation, which they both admitted was based on a misunderstanding and did not make them enemies or prevent them from safety programming together on the same yard. (*Id*. at 18–19.) They point out that Plaintiff initiated physical contact when he responded to Inmate Thompson's verbal challenge by rising from and walking around his own workstation to physically confront Inmate Thompson—which is what led to the brief and unexpected assault—and confronted and challenged Inmate Thompson to a fight later that same day. (*Id*. at 19–21.) Defendants also contend there is no genuine issue of material fact in dispute with respect to whether they acted reasonably, as every time Plaintiff complained he was uncomfortable

having Inmate Thompson work in the same section of the shoe factory, they either moved Inmate Thompson to another section or allowed Plaintiff to leave work.  (*Id*. at 22.)

It is undisputed Inmate Thompson was hired for a legitimate penological purpose, as Plaintiff stated at his deposition that Inmate Thompson was hired for the necessary purpose of performing mechanical repair work.  (ECF No. 66-2 at 30.)  Although the Defendants were involved in the decision as to where in the shoe factory Inmate Thompson was assigned, the undisputed evidence shows each of the three times Inmate Thompson was assigned to work in the sewing section where Plaintiff worked Defendants accommodated Plaintiff's requests for Inmate Thompson to be reassigned.  As described by Plaintiff at his deposition, these include on: (1) May 25, Inmate Thompson's first day of work, he was initially assigned to the sewing section but was immediately reassigned to the snipping section when Plaintiff told Defendants Flores and Bierbaum he was "uncomfortable" working near Inmate Thompson because he was "unpredictable"; (2) July 10, the first time Plaintiff saw Inmate Thompson working in the sewing section, Plaintiff complained to Defendants but before they could respond to ascertain why Plaintiff was "uncomfortable" or why he believed Inmate Thompson was "unpredictable" or what he meant by those terms, Plaintiff interrupted Defendants and asked to leave work because he was uncomfortable and because he was not feeling well, and was allowed to do so; and (3) July 17, the day of the incident, the only other time Plaintiff indicates Inmate Thompson entered the sewing section of the shoe factory, Plaintiff voiced his concern to the inmate lead, not any Defendant, who immediately told Inmate Thompson he could not work in the sewing section.  (ECF No. 66-2 at 25–26, 31, 35–37; ECF No. 79 at 149.)  Thus, it is undisputed Plaintiff was accommodated every time he voiced a concern about working in the same area of the shoe factory as Inmate Thompson, even when he voiced his concern to someone other than a Defendant.

Plaintiff argues Defendants did not reasonably respond to his complaints merely by sending him home the second time he complained and reassigning Inmate Thompson to another area of the factory the first and third times he complained.  He contends Defendants

knew or should have known Inmate Thompson's presence on the shoe factory floor itself, irrespective of which department he was assigned to, gave rise to a risk of assault for two reasons. First, by responding to Plaintiff's complaints rather than ignoring them they exhibited a subjective belief of some type of risk, and second because they had access to the SOMS files which contain details of the February 8, 2017 altercation showing Inmate Thompson had a penchant for violence which Plaintiff responded to by voluntarily moving to another housing unit soon thereafter. (ECF No. 79 at 190–93.) However, the SOMS files show Plaintiff and Inmate Thompson both independently stated that their February 8 altercation was based on a misunderstanding, they were not enemies, and they "can remain housed here on Facility 'D' without further incident." (*Id*. at 140–44.) Plaintiff argues that although he was unconcerned with Inmate Thompson attacking him on the large D-yard where correctional officers are present with little chance they would come in contact. He claims the shoe factory is different, as there are no correctional officers immediately present and Inmate Thompson had access to tools to use as weapons. However, Plaintiff does not dispute Defendants' contention he never expressed that concern to them. Rather, the undisputed evidence shows Plaintiff merely informed Defendants he was "uncomfortable" having Inmate Thompson working in the same section of the factory as him because Inmate Thompson was "unpredictable." Plaintiff admits he had an opportunity on July 10th to explain what he meant. However, instead he interrupted Defendants and asked to go home because he was not feeling well and was uncomfortable with Inmate Thompson working in the sewing section. The only reasons appearing in the record as to why he was uncomfortable around Inmate Thompson are because he believed Inmate Thompson was unpredictable and homosexual. (ECF No. 66-2 at 56.)

Defendants also point out that the undisputed evidence shows even Plaintiff himself did not have a subjective fear of assault by Inmate Thompson. Plaintiff stated at his deposition that when Inmate Thompson was informed by the inmate lead on July 17 that he had to leave the sewing section because his presence made Plaintiff uncomfortable, Inmate Thompson reacted by approaching Plaintiff and saying something. (*Id*. at 34-38.)

Rather than showing fear of assault, Plaintiff stood up, came out from around his workstation and confronted Inmate Thompson, which led to their physical altercation. (*Id*.) It is undisputed that Plaintiff's action of rising from and walking around his workstation to confront Inmate Thompson in response to a verbal challenge led to the physical assault. In addition, Plaintiff admits he challenged Inmate Thompson at that time to fight in front of building 18 after work, and confronted Inmate Thompson in front of building 18 later that evening and again challenged him to fight but Inmate Thompson ran away after which other inmates told him to leave Inmate Thompson alone. (ECF No. 66-2 at 38, 54.)

Defendants have carried their initial burden of "showing the absence of a genuine issue as to any material fact" first with respect to whether they were aware Inmate Thompson posed a substantial risk of serious injury to Plaintiff. Additionally, they have met their burden to show there is no evidence they were deliberately indifferent to such a risk by allowing Inmate Thompson to work in the shoe factory or allowing him to continue to work there after Plaintiff complained he was uncomfortable working in the same section of the shoe factory as Inmate Thompson. *Adickes*, 398 U.S. at 157. In order to avoid summary judgment, Plaintiff must present "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Plaintiff seeks to impute knowledge to Defendants of a risk to his safety by the fact that they responded to his complaints. However, he stated in his deposition he was satisfied with how Defendants responded to his May 25, 2017 complaint and said that he and Inmate Thompson got along by ignoring each other. (ECF No. 66-2 at 27–28.) He stated that on July 10, 2017, Defendants Flores and Bierbaum temporarily allowed Inmate Thompson to repair a canvas cutting press in the sewing department about 10-20 feet inside the boundaries of the sewing department and about 25 to 30 feet from Plaintiff's workstation. (*Id*. at 29–30, 51, 61.) When Plaintiff asked Defendant Flores why Inmate Thompson was in the sewing section, Defendant Flores spoke with Defendant Ekwosi, Inmate Thompson's immediate supervisor, and the two Defendants told Plaintiff they were going to have Inmate Thompson work on that machine. (*Id*. at 30–31.) Plaintiff admitted in his

18cv980

deposition he had an opportunity at that time to explain to Defendants Ekwosi and Flores why he felt uncomfortable with Inmate Thompson working in the sewing section but interrupted them and asked to leave work, which they allowed him to do. (*Id.* at 31.) At the RVR hearing about the July 17, 2017 incident, Plaintiff indicated he told the Defendants on July 10 that he wanted to leave work because he was not feeling well *and* because he was uncomfortable working around Inmate Thompson. (ECF No. 79 at 149.) Plaintiff stated in his deposition that he did not discuss Inmate Thompson with Defendants again until after the July 17, 2017 incident. (ECF No. 66-2 at 32.) Thus, Plaintiff had the opportunity to inform Defendants why he was uncomfortable having Inmate Thompson work in the sewing section of the factory but never did, instead stating he was satisfied with Defendants' response every time prior to the July 17 altercation. Plaintiff has failed to identify specific facts which, if proven, would permit a finder of fact to conclude that his complaints made Defendants subjectively aware of a substantial risk of serious injury from allowing Inmate Thompson to work in the shoe factory.

Plaintiff next contends Defendants were or should have been subjectively aware of an objectively serious risk to his safety through their ability to review inmates' SOMS files, and through their responsibility to consider an inmate's "behavior" as a factor in choosing their work assignment as required by the CDCR Operations Manual. However, the SOMS files contain a compatibility chrono signed by both inmates after their February 8, 2017 altercation indicating they both independently stated the altercation was based on a misunderstanding, that they were able to program safely together and wanted to continue to do so, and that they were not enemies. Plaintiff stated in his deposition that he signed the compatibility chrono because he was unconcerned Inmate Thompson might attack him on the large yard where correctional officers are present, but was concerned Inmate Thompson could attack him in the shoe factory where there are no correctional officers present and Inmate Thompson had access to tools to use as weapons. However, he does not dispute Defendants' assertion that he never expressed that concern to them. Although he argues his SOMS file shows he voluntarily moved to another housing unit soon after

the February 8 altercation, from which he argues knowledge could be imputed that he could only safely program with Inmate Thompson in a separate housing unit on a large yard, he admitted at his deposition he did not give as a reason for that move a fear or concern about Inmate Thompson.   (ECF No. 66-2 at 23.)   Rather, it is undisputed Plaintiff merely informed Defendants he was "uncomfortable" having Inmate Thompson working near him, and Defendants had no knowledge of the reason for that discomfort other than perhaps several months earlier they had an altercation based on a misunderstanding which did not affect their ability or desire to continue to program together safely on the same yard.

Although deliberate indifference "may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm," *Farmer*, 511 U.S. at 839, the circumstances here show the opposite, that Defendants were unaware of a risk to Plaintiff.  Inmate Thompson and Plaintiff each independently indicated their only other altercation was based on a misunderstanding, they could program together safely, and wanted to continue to program together.  Plaintiff never told Defendants why he was "uncomfortable" around Inmate Thompson, other than telling them he thought Inmate Thompson was "unpredictable" but without explaining why, although he had the opportunity to do so, and the only reason appearing in the record is because he believed Inmate Thompson is homosexual.  Even Plaintiff's own self-serving statement he was concerned Inmate Thompson might acquire a weapon in the shoe factory where no corrections officers could immediately respond is belied by the overwhelming evidence Plaintiff repeatedly showed a desire to fight Inmate Thompson.  It is undisputed that it was his act of standing up and coming out from around his workstation to confront Inmate Thompson in response to a verbal challenge which led to their unexpected, brief and avoidable physical altercation, not an unreasonable response by Defendants to a substantial risk to Plaintiff's safety.  Plaintiff has failed to identify "specific facts showing that there is a genuine issue for trial" with respect to whether Defendants knew of or created a risk of assault, and Plaintiff himself was clearly not afraid of being assaulted because he turned a verbal altercation into a physical one and challenged Inmate Thompson to another fight

later that same evening. *Anderson*, 477 U.S. at 256.

Accordingly, because there is no genuine issue of disputed fact that Defendants did not know of or deliberately disregard a substantial risk of serious harm to Plaintiff, summary judgment is appropriate as to Plaintiff's Eighth Amendment claim.

## C.   First Amendment Retaliation Claim

Plaintiff seeks to hold Defendants liable under the First Amendment for failure to protect him from assault by Inmate Thompson in retaliation for complaining that Defendant Ekwosi "used profanity at Plaintiff." (ECF No. 40 at 3.) Defendants assert this claim is speculative and without evidentiary support because it is undisputed Inmate Thompson applied to work at the shoe factory over a month before Plaintiff made his complaint and hired for a legitimate purpose more than a month after that. Additionally, they could not have had a retaliatory motive because they had no reason to believe Inmate Thompson posed a threat to Plaintiff. (ECF No. 66 at 21–22.)

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Defendants have the initial burden of showing summary judgment is proper "by showing the absence of a genuine issue as to any material fact." *Adickes*, 398 U.S. at 157. They contend the undisputed evidence shows they did not take any adverse action against Plaintiff at all, much less because of his complaint, as any action they took reasonably advanced a legitimate correctional goal of staffing the shoe factory. Plaintiff admits the CDCR Operations Manual provides that Defendants are responsible for staffing and managing the shoe factory, and he stated at his deposition that he knew Inmate Thompson

was hired for the legitimate purpose of performing mechanical repair work.  (ECF No. 66-2 at 30.)  Although there is evidence in the record Defendants were involved in the decision as to where in the shoe factory Inmate Thompson was assigned, the undisputed evidence shows that *every* time Inmate Thompson was assigned to work in the sewing section where Plaintiff worked, Plaintiff's requests not to work in the same area of the factory were immediately accommodated to Plaintiff's satisfaction.  The day Inmate Thompson started work on May 25 he was initially assigned to the sewing section but immediately reassigned before he started work when Plaintiff voiced concern.  Plaintiff stated at his deposition he was satisfied with that response and that he and Inmate Thompson got along by ignoring each other.  (ECF No. 66-2 at 27–28.)  The first time Inmate Thompson was in the sewing section was when he was working on a machine on July 10, 2017.  Plaintiff complained to Defendants, but before they could respond to his complaint, he asked to leave work because he was not feeling well *and* because he was uncomfortable working around Inmate Thompson and was allowed to do so.  Plaintiff had an opportunity at that time to inform Defendants of a risk of assault from Inmate Thompson working in his section of the factory, or working anywhere in the factory, but refused to do so.  The third and final time Inmate Thompson entered the sewing section was July 17, and Inmate Thompson was immediately told to leave the area after Plaintiff voiced his concern to the inmate lead.

Accordingly, the undisputed evidence shows Plaintiff never provided information to the Defendants from which a reasonable inference could be drawn Plaintiff believed Inmate Thompson posed a risk to Plaintiff's safety.  And his requests not to work in the same section as Inmate Thompson were immediately and always accommodated, twice by removing Inmate Thompson from the sewing section and once by granting Plaintiff's request to leave work.  Even if Defendants could somehow have been aware Plaintiff's discomfort with Inmate Thompson was based on a fear of Inmate Thompson, his requests to be separated were accommodated to his satisfaction every time.  Plaintiff has not identified specific facts showing Defendants' responses to his complaints constituted adverse actions which lacked a legitimate penological purpose, or that they allowed Inmate

Thompson to work in the shoe factory in retaliation for Plaintiff filing a complaint against Defendant Ekwosi.  Rather, Plaintiff twice indicated he was able to program safely with Inmate Thompson, twice refused to place him on his enemies list, twice said their altercations were based on misunderstandings rather than personal hostility, and rather than show fear when verbally challenged by Inmate Thompson at the shoe factory, he stood up from and walked around his workstation to physically confront him.  In sum, there is no evidence Defendants were aware from Plaintiff's complaints, or could have become aware by looking at the SOMS files, that Plaintiff was uncomfortable around Inmate Thompson due to a threat of attack as opposed to the reason Plaintiff gave at his deposition, that he was uncomfortable around Inmate Thompson because he believed Inmate Thompson is homosexual.

Accordingly, Defendants have shown there is no genuine issue of material fact in dispute that they allowed Inmate Thompson to work in the shoe factory for the legitimate purpose as a mechanic: he was on the wait list as of March 9, 2017 over a month before Plaintiff's April 11, 2017 complaint about Defendant Ekwosi's use of language and he was hired on May 25, 2017, six weeks after Plaintiff made his complaint.  Defendants did not take any adverse action against Plaintiff by allowing Inmate Thompson to continue to work in the shoe factory after Plaintiff informed them he was uncomfortable with Inmate Thompson working in the sewing section, but, in fact, reasonably accommodated every request Plaintiff made by having Inmate Thompson work in a different section of the factory.  Defendants have pointed to the absence of a genuine issue as to a material fact with respect to whether they "took some adverse action against [Plaintiff] because of [his] protected conduct, and that such action . . . did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68.

In order to avoid summary judgment, Plaintiff must present "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  He contends a retaliatory motive can be inferred from the timing of events: (1) he and Inmate Thompson had an altercation on February 8, 2017 which was documented in their files; (2) Inmate Thompson

18cv980

was placed on the shoe factory wait list on March 9, 2017; (3) Plaintiff verbally complained on April 11, 2017 to Defendant Flores about Defendant Ekwosi's use of profanity that day and filed a written complaint on May 4, 2017; (4) inmate Thompson was hired on May 25, 2017, after two and one-half months on the wait list whereas Plaintiff was on the wait list only a month; (5) Plaintiff informed Defendants Flores and Ekwosi on July 10, 2017 that he was not comfortable around Inmate Thompson; and (6) he was assaulted by Inmate Thompson a week later on July 17, 2017.  (ECF No. 79 at 198–201.)

Although timing can be considered as circumstantial evidence of retaliatory intent, it is not enough to support a retaliation claim "where there is little else to support the inference." *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).  Inmate Thompson was on the wait list over a month before Plaintiff complained about Defendant Ekwosi and was not hired until six weeks after the complaint, and Plaintiff admitted in his deposition Inmate Thompson was hired for the legitimate job as a mechanic.  Although any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255, no inference of retaliation can be drawn from the timing of events, as the lack of evidence Plaintiff was at risk of assault by Inmate Thompson, either in his own mind or in the minds of the Defendants, precludes an inference the hiring and supervision of Inmate Thompson was arranged from a retaliatory motive.

Even if Plaintiff could somehow overcome that deficiency, he does not challenge Defendants' evidence that Inmate Thompson was hired for a legitimate purpose, and in fact admitted in his deposition that Defendants "wanted [Inmate Thompson] as a mechanic." (ECF No. 66-2 at 30.)  With respect to retaliation claims, federal courts "should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  *Pratt*, 65 F.3d at 807, (quoting *Sandin v. Connor*, 515 U.S. 472, 482 (1995)).  In addition, the undisputed facts show Defendants reasonably accommodated *every* request Plaintiff made not to have Inmate Thompson work in his section.  And it was not Defendants' action of allowing Inmate Thompson to work on the show factory floor which led to the assault but Plaintiff's

18cv980

action of turning a verbal encounter into a physical altercation.  *See Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (holding that in order to bring a retaliation claim a prisoner must show more than retaliation, but "must also allege that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals.")

Defendants have carried their burden of showing there is no genuine issue of material fact whether any of their actions "did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68.  Plaintiff has failed to identify "specific facts showing that there is a genuine issue for trial," and has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 255.  Accordingly, summary judgment is appropriate in favor of Defendants on Plaintiff's First Amendment retaliation claim.

### D.      Fourteenth Amendment Substantive Due Process Claim

In his final federal claim, Plaintiff alleges a violation of his Fourteenth Amendment substantive due process right to be free from a state-created danger of assault, alleging that Defendants encouraged Inmate Thompson to assault him.  (ECF No. 40 at 12.)  Defendants contend this claim should be dismissed because Plaintiff may not proceed with a substantive due process claim where, as here, the Eighth Amendment provides an explicit textual source of constitutional protection.  (ECF No. 66 at 23.)  They also argue the claim fails for the same reasons his other federal claims fail.  (*Id*.)  Plaintiff argues Defendants cannot rely on the failure of his other federal claims to defeat this claim because his First and Eighth Amendment claims are valid for the reasons he has set forth with respect to those claims.  (ECF No. 79 at 201.)

Federal courts should generally analyze constitutional claims using an "explicit textual source of constitutional protection," such as deliberate indifference under the Eighth Amendment, rather than the Fourteenth Amendment's "more generalized notion of substantive due process." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Nevertheless,

18cv980

deliberate indifference can rise to a substantive due process violation when "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). However, it is only state action that "shocks the conscience" which deprives an individual of substantive due process. *Id*. at 847 (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). A state actor's conduct "shocks the conscience" where it was intended to cause harm without a legitimate governmental justification. *Lewis*, 523 U.S. at 855.

As set forth above, there is no genuine issue of material fact regarding whether Inmate Thompson was hired for a legitimate penological reason or that Defendants were aware of a threat to Plaintiff arising from Inmate Thompson working in the shoe factory, and therefore no evidence Defendants intended to harm Plaintiff without a legitimate penological justification. It was Plaintiff's own action of physically confronting Inmate Thompson in response to a verbal challenge which led to the assault, not any conscience-shocking conduct by Defendants.

Although the Court declines to dismiss Plaintiff's Fourteenth Amendment claim for the reasons requested by Defendants, that he is unable to bring such a claim, the Court finds summary judgment is appropriate on this claim for the same reasons summary judgment is appropriate on Plaintiff's Eighth Amendment claim.

### E.    State Law Claims

Plaintiff claims Defendants violated the California Code of Civil Procedure, the California Labor Code, the California Code of Regulations applicable to prisons, and Article I, sections 7, 15 and 17 of the California Constitution, which he contends are analogous to federal protections against retaliation, cruel and unusual punishment, and denial of due process. (ECF No. 40 at 15-16.) Defendants argue that the regulations invoked by Plaintiff do not provide for private causes of action. (ECF No. 66 at 24–25.) Defendants further argue that Plaintiff cannot obtain relief on the state constitutional claims

because California law establishes that those provisions do not support a claim for monetary damages. (*Id.* at 26.)   Lastly, as to Plaintiff's claim for an injunction seeking to prevent Defendants from violating state laws, Defendants argue that it is moot because he is no longer housed at RJD and no longer works in the shoe factory there. (*Id.*)

Federal courts have supplemental jurisdiction over state law claims which are part of the same case or controversy which confers original jurisdiction. 28 U.S.C. § 1367(a). The Court may decline supplemental jurisdiction when, as here, it has dismissed all such federal claims. *Id*. § 1367(c).   In making the decision whether to accept or decline supplemental jurisdiction, the Court considers "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  When all federal claims are eliminated before trial, these factors "will point toward declining to exercise jurisdiction over the remaining state law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.") (citing *Cohill*, 484 U.S. at 350 n.7).

Because the Court grants summary judgment as to all Plaintiff's federal claims, the Court declines supplemental jurisdiction of his state law claims, which will be dismissed without prejudice to refiling in state court.

### F.   Qualified Immunity

Finally, Defendants argue they are entitled to qualified immunity because even if a constitutional violation occurred, the undisputed facts show they acted reasonably in permitting Inmate Thompson to work near Plaintiff's section of the shoe factory because Plaintiff voluntarily programmed with Inmate Thompson and twice declined opportunities to be isolated from him. (ECF No. 66 at 23–24.)  Plaintiff argues qualified immunity is not available because his rights to be free from retaliation and deliberate indifference to his safety were clearly established at the time of the events. (ECF No. 79 at 201–03.)

Because the Court has found Defendants are entitled to summary judgment as to all of Plaintiff's federal claims, it need not reach the issue of qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *Lewis*, 523 U.S. at 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.")

## IV.   CONCLUSION AND ORDER

Based on the foregoing, the Court **GRANTS** Defendants'   Motion   for   Summary Judgment (ECF No. 66).  The Clerk of Court shall enter judgment in favor of Defendants Bierbaum, Ekwosi and Flores as to all federal claims in the Second Amended Complaint; Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

**DATED: June 30, 2020**

Hon. Cynthia Bashant
United States District Judge

18cv980